WILLIAMS, Appellee,

v.

MARTIN MARIETTA ENERGY SYSTEMS, INC., Appellant;
Ohio Bureau of Workers' Compensation et al., Appellees.

[Cite as *Williams v. Martin Marietta Energy Sys., Inc.* (1994), 99 Ohio App.3d 520.]

Court of Appeals of Ohio,
Fourth District, Pike County.

No. 93 CA 521.

Decided Dec. 27, 1994.

*James E. Wilhelm, Jr.,* for appellee Mark E. Williams.

*Vorys, Sater, Seymour & Pease* and *Robert E. Tait,* for appellant.

*Lee Fisher,* Attorney General, and *Richard A. Hernandez,* Assistant Attorney General, for appellees Bureau of Workers' Compensation and Industrial Commission.

---

PETER B. ABELE, Judge.

This is an appeal from a judgment entered by the Pike County Common Pleas Court in favor of Mark E. Williams, plaintiff below and appellee herein, and against Martin Marietta Energy Systems, Inc., defendant below and appellant herein.

Appellant assigns the following error:

"The trial court erred in finding that Williams' injury occurred in the course of and arising out of his employment."

For the past several years, appellant has participated in Red Cross blood drives for its employees. The blood drives are conducted one to three times per year on the plant premises. Appellant did not reduce an employee's wages for the time spent donating blood if the employee gave blood during normal work hours. Appellant's public relations department advertises the drives, registers employees, prepares schedules of donors, and submits the schedules to the Red Cross. Appellant's employees assist the Red Cross staff during each drive by preparing the room and serving refreshments provided by appellant. Appellant's medical staff is on alert throughout the day of each drive in order to treat any medical complications that develop.

On January 3, 1990, the Red Cross held a blood drive at the plant. Appellee, an employee of appellant, attended this drive. When a Red Cross staff member attempted to draw blood from appellee's arm, he suffered an injury.

On June 16, 1993, appellant and appellee filed a joint stipulation of facts which provided in pertinent part as follows:

"1. Martin Marietta Energy Systems, Inc., (hereinafter Martin Marietta) has cooperated with the Red Cross in conducting a blood drive for Martin Marietta employees one to three times per year since it assumed control of the plant from Goodyear Atomic Corp.

"2. Plaintiff, Mark Williams was an employee of Martin Marietta on January 3, 1990.

"3. An American Red Cross blood drive was conducted on Martin Marietta premises on January 3, 1990 in Pike County, Ohio.

"4. On January 3, 1990 during regular business hours, Plaintiff, Mark Williams, suffered an injury to his left arm when Red Cross personnel attempted to draw blood from him during the Red Cross blood drive.

"5. Martin Marietta permitted any of its employees to participate in the Red Cross blood drive.

"6. If a Martin Marietta employee contributed to the American Red Cross blood drive during normal working hours, there was no reduction in wages for the time that the employee participated in the activity.

"7. Martin Marietta has an on-premises transportation system available for use by its employees which may be utilized by employees traveling to the blood donation site.

"8. Martin Marietta's Public Relations Department coordinated with the American Red Cross the dates and times which the Red Cross would conduct the blood drive on Martin Marietta premises.

"9. Pre-registration for the blood drive was coordinated by Martin Marietta's Public Relations staff.

"10. Martin–Marietta's Public Relations Department organized the scheduling of blood donations through sign-up sheets and registration forms and then provided the Red Cross with a schedule of donors.

"11. Martin Marietta Public Relations Department produced and posted flyers announcing the on premises Red Cross blood drive up to six weeks in advance.

"12. Martin Marietta's Public Relations staff also distributed to Martin Marietta employees pamphlets and other announcements received from the Red Cross.

"13. Subsequent to the 1992 strike, Martin Marietta's Public Relations office issued a press release and photos to local newspapers regarding the Red Cross blood drive for the purpose of showing camaraderie between Martin Marietta and its employees.

"14. Local newspapers of general circulation have published articles regarding the results of the Red Cross blood drives conducted at Martin Marietta.

"15. Martin Marietta employees were present at the blood donation site to assist Red Cross staff.

"16. Martin Marietta gives employees who donate blood recognition in the company newsletters following Red Cross blood drives.

"17. Martin Marietta provides refreshments, such as soda pop, ice water, orange juice and sandwiches, free of charge, to employees who have participated in the blood drive.

"18. For any Red Cross blood drive on its premises, the Public Relations department will contact the Martin Marietta medical staff, either by letter or telephone, to ensure that the medical staff will be available if needed.

"19. As part of its course of conduct in preparing for the Red Cross blood drive, the attached documents (Exhibits A–Y) were issued and/or disseminated by Martin Marietta personnel. Such documents are intended to be used as evidence in the disposition of this matter."

The Exhibits A through Y attached to the stipulations of fact included internal correspondence from appellant to its employees concerning the blood drive. Exhibit A asked certain employees to "walk around your division" and ask people if they have already signed up for the blood drive or ask "if you can give them a form to sign up." Exhibit B told employees that the blood drive is very important and "not only does it provide free blood replacement for our employees and their immediate families," but it also helps others and "produces quality public relations." Exhibit D told "bloodmobile team representatives" that "the pressure is on to exceed our last blood drive total of 187 units" and "please walk around your division and ask people if they have already signed up." Exhibit D told the representative employees that "a gentle 'push' is needed, if we are to be successful." Exhibit M listed nearly one thousand employees of appellant's employees and indicated the number of blood units each employee has donated and the blood type of many of the employees on the list. Other exhibits documented the fact that appellant provided many services and other items to aid the Red Cross blood drive, including lunches, refreshments, loading and unloading services, janitorial services, typewriters, a telephone, backup medical services, and security services.

After being injured at the January 3, 1990 Red Cross blood drive on appellant's premises, appellee filed a claim with the Ohio Bureau of Workers' Compensation.[1] On March 12, 1992, the district hearing officer rejected appellee's claim. Appellee filed a notice of appeal from the district hearing officer's decision.

On January 21, 1992, the Columbus Regional Board of Review disagreed with the district officer's decision and allowed appellee's claim. Appellant filed a notice of appeal from the board of review's decision.

---

1. Although we do not have a copy of the proceedings that occurred before the Ohio Bureau of Workers' Compensation, the Columbus Regional Board of Review, and the Ohio Industrial Commission, we have gleaned the following information about those proceedings from appellee's December 10, 1992 complaint.

In a decision dated July 22, 1992, and mailed August 5, 1992, the Industrial Commission of Ohio found that appellee sustained injury in the course of and arising out of employment. On September 30, 1992, appellant filed a notice of appeal from the Industrial Commission's decision to the trial court in the instant case. On December 10, 1992, appellee filed a complaint in the instant case seeking a judgment holding that he is entitled to participate in the Ohio Workers' Compensation Fund.

On September 24, 1993, the trial court entered judgment ordering appellee's participation in the Workers' Compensation Fund. The court found by a preponderance of the evidence that appellee's injuries occurred in the course of and arose out of his employment with appellant.

Appellant filed a timely notice of appeal.

In its sole assignment of error, appellant asserts that because the Red Cross conducted the blood drive and because a Red Cross staff member injured appellee's arm while attempting to draw blood, appellee did not receive the injury in the course of and arising out of his employment.[2] Appellee counters that because the Red Cross held the blood drive on appellant's premises with appellant's cooperation and organizing assistance, and because appellant benefitted from the positive publicity of the blood drive, appellee did receive the injury to his arm in the course of and arising out of his employment.

In order for an injured employee to collect workers' compensation benefits, the injury must have been "received in the course of, and arising out of, the injured employee's employment." R.C. 4123.01(C). Traditionally, courts have bifurcated the "in the course of" and the "arising out of" elements, but in *Fisher v. Mayfield* (1990), 49 Ohio St.3d 275, 277, 551 N.E.2d 1271, 1274, the Ohio Supreme Court wrote:

"We now expressly recognize the conjunctive nature of the coverage formula of 'in the course of and arising out of' the employment. Therefore, all elements of the formula must be met before compensation will be allowed.

" * * * The 'in the course of' prong is construed to relate to the time, place and circumstances of the injury, while the 'arising out of' prong is interpreted as referring to a causal connection between the employment and the injury. [1] Larson, [The Law of Workmen's Compensation (1984) ] at 3–3, Section 6.10. See, also, *State Comp. Ins. Fund v. Workers' Comp. Appeals Bd.* (1982), 133 Cal. App.3d 643, 652, 184 Cal.Rptr. 111, 116." See, also, *Elsass v. Commercial Carriers, Inc.* (1992), 73 Ohio App.3d 112, 596 N.E.2d 599; *Moffitt v. Ohio Bur. of*

---

2. In its brief, appellant indicates that appellee reached a settlement with the Red Cross concerning the injury.

*Workers' Comp.* (1991), 78 Ohio App.3d 48, 603 N.E.2d 1110; *Fletcher v. Northwest Mechanical Contr., Inc.* (1991), 75 Ohio App.3d 466, 599 N.E.2d 822.

■■ Generally, an employee acts in the course of employment while performing obligations of the employment contract. Fulton, Ohio Workers' Compensation Law (1991) 148, Section 7.6, citing *Indus. Comm. v. Davison* (1928), 118 Ohio St. 180, 160 N.E. 693. However, "[a]n injured employee need not be in the actual performance of his duties in order for his injury to be in the 'course of employment,' and thus compensable." *Kohlmayer v. Keller* (1970), 24 Ohio St.2d 10, 11, 53 O.O.2d 6, 6, 263 N.E.2d 231, 232. An employee is within the course of his employment "when he 'does such things as are usually and reasonably incidental to the work of the employer, including the taking of refreshments, rest and smoke, which are not forbidden by the employer * * *.' " *Lemming v. Univ. of Cincinnati* (1987), 41 Ohio App.3d 194, 196, 534 N.E.2d 1226, 1228, quoting *Taylor v. Indus. Comm.* (1920), 13 Ohio App. 262, 270.

■ In *Fisher,* the court not only recognized the conjunctive nature of the "in the course of" and the "arising out of" prongs, but also restated the three-part test for determining whether a given injury "arose out of" the injured person's employment of *Lord v. Daugherty* (1981), 66 Ohio St.2d 441, 20 O.O.3d 376, 423 N.E.2d 96. The court wrote:

" * * * In *Lord v. Daugherty* (1981), 66 Ohio St.2d 441, 20 O.O.3d 376, 423 N.E.2d 96, we held at the syllabus:

" 'Whether there is a sufficient "causal connection" between an employee's injury and his employment to justify the right to participate in the Workers' Compensation Fund depends on the totality of the facts and circumstances surrounding the accident, including: (1) the proximity of the scene of the accident to the place of employment; (2) *the degree of control the employer had over the scene of the accident,* and (3) the benefit the employer received from the injured employee's presence at the scene of the accident.' " (Emphasis added.) *Id.,* 49 Ohio St.3d at 277, 551 N.E.2d at 1274.

In *Fisher,* the court discussed, *inter alia,* the second *Lord* factor, which involves an examination of the degree of control the employer had over the scene of the accident. The court specified that courts must examine the employer's degree of control over the situs of the accident, not the employer's degree of control over the employee at the time of the accident. The court wrote in pertinent part:

"The second factor involves the degree of control the employer had over the scene of the accident. Appellees argue that the school board had no control over the voluntary actions of appellant in going to Kaiser Elementary School. However, the appellees misconstrue the analysis. The proper scrutiny entails the

*amount of control the employer had over the situs of the injury, and not the degree of control the employer had regarding the actions of its employees.* \* \* \* Clearly, it cannot be denied that the school board had complete control over the steps leading to and from one of its own schools, hence appellant has also satisfied the second factor." (Emphasis added.) *Id.*, 49 Ohio St.3d at 279, 551 N.E.2d at 1275.

In *Tamarkin Co. v. Wheeler* (1992), 81 Ohio App.3d 232, 610 N.E.2d 1042, the Ninth District likewise quoted and followed the *Lord* three-part test for determining whether a given injury "arose out of" the injured person's employment. In that case, Wheeler lacerated his right hand when inspecting or attempting to repair vandalism damage that had occurred to his Jeep in the employer's parking lot earlier in Wheeler's shift. When considering the second prong of three-part *Lord* test, the degree of control the employer had over the scene of the accident, the Ninth District wrote:

"Turning to the second prong, it is readily apparent that Tamarkin's degree of control over the accident was minimal. We are at a loss to understand what the employer could have reasonably done to prevent Wheeler from cutting himself during the impromptu repair job. \* \* \* " *Id.*, 81 Ohio App.3d at 235, 610 N.E.2d at 1044.

In conclusion, the Ninth District stated:

"Any relationship between Wheeler's injury and Tamarkin was purely fortuitous. Cutting one's hand on a broken rearview mirror is not a risk incident to the duties of a baker's apprentice. \* \* \* The combined facts that (1) the vandal chose the Giant Eagle parking lot as the scene of the crime, and (2) Wheeler decided to attempt the hazardous repair during his working hours, are not sufficient to justify participation in the Worker[s'] Compensation Fund." *Id.*, 81 Ohio App.3d at 236, 610 N.E.2d at 1044. See, also, *Lemming v. Univ. of Cincinnati* (1987), 41 Ohio App.3d 194, 534 N.E.2d 1226, where the First District hinged its decision in major part on the fact that the device which injured the employee during her morning break was under the employer's control.

▇ In the case *sub judice,* appellant asserts that it lacked control over the Red Cross employees and their attempted drawing of blood from appellee's arm. We agree. Although appellant provided the Red Cross with comprehensive cooperation and organizing assistance for the blood drive, appellant had no control over the attempted drawing of blood from appellee's arm. The record contains no evidence to the contrary. Hence, we find the injury to appellee's arm did not arise out of appellee's employment.

▇ We also find that the injury to appellee's arm did not occur during the course of appellee's employment. We agree with appellant that the blood drive

was not a usual and reasonable incidental activity to appellee's employment. Despite the evidence that appellee's supervisors told him "it would be a good idea" to donate blood, the record does not reveal any evidence that donating blood was a regular incident and condition of the employment.

In Larson, The Law of Workmen's Compensation (1992) 5–418 to 5–419, Section 27.34(a), Larson wrote that nonemergency civic acts conducted on an employer's premises are not within the course of employment:

"Apart from the emergency doctrine, which is dealt with in the next section, acts that are nothing more than the discharge of a person's duties as a good citizen or member of the community are not within the course of employment, even if they take place on the employment premises and may have been requested by the employer. * * *"

Larson cited *Mauser v. Douglas & Lomason Co.* (1974), 192 Neb. 421, 222 N.W.2d 119, where the employer permitted employees to donate blood to the Red Cross on company time. When denying the petition for benefits, the *Mauser* court noted that the employer had no control over the blood-donation activity. Larson also cited *Riggen v. Paris Printing Co.* (Mo.App.1977), 559 S.W.2d 625, where the employee suffered injury while on her way to a charity breakfast after she began working one day. The employer had given the employee a free ticket to the breakfast. The court denied compensation, noting that the breakfast was insufficiently related to the employment and noting that the employer did not compel the employee to go to the breakfast.

The year after Larson wrote the above article, an Oklahoma appellate court decided *Wright v. Gen. Motors Corp.* (Okla.App.1993), 848 P.2d 61, against an employee who sustained injury while giving blood at a Red Cross blood drive held during working hours on her employer's premises. The Oklahoma court wrote in pertinent part as follows:

"The Oklahoma appellate courts have not addressed the precise issue of an employer's liability for workers' compensation for injury occurring in civic activities. However, they have addressed analogous situations in the context of recreational or social activities. * * *:

" 'Recreational and social activities are within the course of one's employment: (1) when they occur on the premises during a lunch or recreation period as a regular incident to the employment; or (2) when the employer *expressly or impliedly* induces participation, or makes the activity come within the orbit of employment duties; or (3) when the employer derives from the activity substantial direct benefit that extends beyond the intangible value of employees' health or moral improvement which is common to every kind or recreational social

event.' [ (Emphasis *sic.*) *Oklahoma Natural Gas Co. v. Williams* (Okla.1981), 639 P.2d 1222, 1223.]

"An application of the [above] factors to the case at bar demonstrates that Claimant has failed to show that the activity of giving blood is within the course of her employment. With respect to factor one, it is clear that the alleged injury occurred on the premises during a 'civic' period carved out by the Employer. However, the record fails to establish that this activity (blood drive) occurred as a regular incident of employment. There is no testimony that establishes a causal connection between the act of giving blood and the requirements of employment at General Motors. * * *

"The second factor * * * deals with 'compulsory attendance.' One who is expressly required to participate is clearly furthering the master's business. *Williams*, 639 P.2d at 1224. Employer made no direct order to Claimant to give blood. Moreover, Claimant failed to prove any managerial behavior pattern from which to imply compulsory participation. * * *

"Finally, Claimant failed to show that Employer derived a substantial direct benefit from the blood drive. * * * There must be a substantial direct benefit that extends beyond the intangible and speculative value of enhancing company goodwill. * * *" 848 P.2d at 62–63.

The *Wright* court quoted and followed the Nebraska Supreme Court's *Mauser* decision where the court held that the employer " 'received no benefit from the plaintiff's participation in the program except that which might flow from its willingness to cooperate with the program by offering employees time off with no loss of pay.' " 848 P.2d at 63.

■ In the case *sub judice*, we similarly find that appellant received no benefit from appellee's participation in the blood drive except that which might flow from appellant's willingness to cooperate with the blood drive by permitting employees to donate blood without a loss of pay. Appellee did not present evidence that he was required to participate in the blood drive in order to maintain his position with appellant or to advance within the company. In his deposition, John E. Christian, one of appellant's public affairs employees, stated that the management does not coerce employees to participate and that the extent of management's encouragement of participation is to publicize the drive and "not [to] discourage it." In addition, Christian stated that out of 2,700 total employees, only one hundred eighty to two hundred twenty participate in any given blood drive. This less-than-ten-percent employee participation further emphasizes the fact that appellant did not consider the blood drive to be a regular incident and condition of employment.

■ In summary, we agree in general that acts that are nothing more than the discharge of a person's duties as good citizen or member of the community are

not within the course of employment, even if they take place on the employment premises and may have been requested by the employer. Larson, The Law of Workmen's Compensation (1992) 5–418 to 5–419, Section 27.34(a). See, generally, *Wright v. Gen. Motors Corp.* (Okla.App.1993), 848 P.2d 61; *Belnap v. Boeing Co.* (1992), 64 Wash.App. 212, 823 P.2d 528 (employee was not acting in scope of his employment while serving on jury duty); *Riggen v. Paris Printing Co., supra,* (Mo.App.1977), 559 S.W.2d 625 (employee's attendance at an annual benefit pancake breakfast sponsored in part by the employer, which attendance was encouraged but not required by management, was not within the scope of employment); *Mauser v. Douglas & Lomason Co., supra,* 192 Neb. 421, 222 N.W.2d 119 (employee's off-premises blood donation was not within scope of employment even though employee donated blood during work hours and employer paid employee's wage during the donation); *Bituminous Cas. Co. v. Indus. Comm.* (1944), 245 Wis. 337, 13 N.W.2d 925 (errands in connection with teachers' work as unpaid volunteers in assisting in issuance of war ration books was not within the scope of their employment); *Burton v. Verona Bd. of Edn.* (N.J.Dept. of Labor 1943), 21 N.J.Misc. 108, 31 A.2d 337 (teacher's work in assisting in issuance of war ration books was not within the scope of her employment).

Accordingly, based upon the foregoing reasons, we sustain appellant's assignment of error.

*Judgment reversed.*

STEPHENSON, J., concurs in judgment only.

GREY, J., dissents.